1 | MELINDA HAAG (CABN 132612)
United States Attorney

2 |

3 | J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

4 | BENJAMIN KINGSLEY (NYBN 4758389)
Assistant United States Attorney

5 |     450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495

6 |     Telephone: (415) 436-6937
    Fax: (415) 436-7234

7 |     benjamin.kingsley@usdoj.gov

8 | Attorneys for the United States

**FILED**

NOV 19 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9 |

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13 | UNITED STATES OF AMERICA,     )  NO. CR 14-00264 VC
   )  [FILED MAY 14, 2014]

14 |     Plaintiff,     )

15 |     v.     )

16 | JOSEPH NOEL,     )

17 |     Defendant.     )

18 |

19 | SECURITIES AND EXCHANGE     )  NO. CV 14-05054 JSW
COMMISSION,     )  [FILED NOVEMBER 17, 2014]

20 |

21 |     Plaintiff,     )  **NOTICE OF RELATED CASE IN A CRIMINAL
ACTION**

22 |     v.     )

23 | JOSEPH A. NOEL,     )  ~~FILED UNDER SEAL~~

24 |     Defendant.     )

25 |

26 |         The United States of America, pursuant to Local Criminal Rule 8-1, hereby notifies the Court

27 | that the two above-captioned cases are related.

28 |

NOTICE OF RELATED CASES
UNITED STATES v. NOEL, CR 14-00264 VC;
SECURITIES AND EXCHANGE COMMISSION v. NOEL, CR 14-05054 JSW

On May 14, 2014, Joseph Noel was charged in case number CR 14-00264 VC with one count of securities fraud in connection with the securities of YesDTC Holdings, Inc., in violation of 18 U.S.C. § 1348 (Attachment A).  That case was initiated under seal, as defendant was cooperating with the government (Attachment B).  On June 23, 2014, defendant pleaded guilty to the charge in the information and entered into a plea agreement with the government (Attachment C).  Also on that date, Judge Chhabria ordered that the case remain sealed.  In his plea agreement, defendant admitted to participating in the manipulation of the market of YesDTC stock, and of selling stock through his daughter in order to avoid SEC disclosure rules.

On November 17, 2014, the Securities and Exchange Commission ("SEC") filed a civil complaint against defendant, in case number CV 14-05054 JSW.  The complaint alleges civil violations of the securities laws (Attachment D).  The complaint involves substantially the same conduct as charged in the information in the criminal case, and to which defendant pleaded guilty—defendant's manipulation of the market for securities in YesDTC and his sale of those securities through his daughter to avoid SEC disclosure rules.

Based upon these facts, the cases are related within the meaning of Local Rule 8-1(b)(1) because they involve the same defendant and the same alleged events, occurrences, and transactions.  The cases are also related within the meaning of Local Rule 8-1(b)(2) because if heard by separate judges they likely would involve substantial duplication of labor by the two judges.  Per the requirement of Local Criminal Rule 8-1(c)(4), undersigned counsel states that assignment of these cases to a single judge is likely to conserve judicial resources and promote an efficient determination of each action.

The United States files these Notices in each docket number under seal because the older case, CR 14-00264 VC, remains under seal.  For the same reason, the United States will not serve a copy of this notice on the SEC.

Dated: November 19, 2014

Respectfully submitted,

MELINDA HAAG
United States Attorney

BENJAMIN KINGSLEY
Assistant United States Attorney

NOTICE OF RELATED CASES
UNITED STATES v. NOEL, CR 14-00264 VC;
SECURITIES AND EXCHANGE COMMISSION v. NOEL, CR 14-05054 JSW

# ATTACHMENT A

MELINDA HAAG (CABN 132612)
United States Attorney

*FILED*

*2014 MAY 14  A 9 43*

*RICHARD W. WIEKING*
*CLERK U.S. DISTRICT COURT*
*N. THERN DISTRICT COURT*
*. F CALIFORNIA*

*SEALED*
*BY COURT ORDER*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**VC**

**CR  14   264**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|     Plaintiff, | ) |
|     v. | ) |
| JOSEPH NOEL, | ) |
|     Defendant. | ) |

VIOLATION: 18 U.S.C. § 1348 – Securities Fraud;
18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461 –
Criminal Forfeiture

SAN FRANCISCO VENUE

## I N F O R M A T I O N

The United States Attorney charges:

1. From in or about December 2009 to in or about July 2011, in the Northern District of California, the defendant,

JOSEPH NOEL,

did knowingly execute and attempt to execute a scheme and artifice to defraud persons and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property, in connection with securities of YesDTC Holdings, Inc., an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), in violation of Title 18, United States Code, Section 1348.

//

//

INFORMATION

FORFEITURE ALLEGATION:      (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461 – Forfeiture of Fraud Proceeds)

2.      The allegations in Paragraph 1 are realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

3.      Upon conviction of any the offenses alleged in the single count above, the defendant,

JOSEPH NOEL

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any property, real and personal, which constitutes or is derived from proceeds traceable to said violations, including but not limited to a sum of not less than $367,221, representing the amount of proceeds obtained as a result of the offenses alleged in the single count.

DATED:      May 13, 2014

MELINDA HAAG
United States Attorney


J. DOUGLAS WILSON
Chief, Criminal Division


(Approved as to form: _____ )
Benjamin Kingsley
Assistant United States Attorney

INDICTMENT

2

PER 18 U.S.C. 3170

**DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT**

BY: ☑ INFORMATION  ☐ INDICTMENT

CASE NO.

Matter Sealed: ☐ Juvenile  ☑ Other than Juvenile
☐ Pre-Indictment Plea  ☐ Superseding
☐ Defendant Added
☐ Indictment  ☐ Charges/Counts Added
☐ Information

~~*FILED*~~

USA vs
Defendant: Joseph Noel

CR 14 264

*2014 MAY* ...
*RICHARD W. WIEKING*
*CLERK U.S. DISTRICT COURT*
*NORTHERN DISTRICT COURT*
*CALIFORNIA*

Name of District Court, and/or Judge/Magistrate Location (City)

UNITED STATES DISTRICT COURT    San Francisco
DISTRICT OF Northern California    Divisional Office

Address:
1155 C Arnold Drive
P.O. Box 168
Martinez, CA 94553

*VC*

Name and Office of Person    MELINDA HAAG
Furnishing Information on ☐ U.S. Atty ☐ Other U.S. Agency
THIS FORM    Phone No.

**SEALED**
**BY COURT ORDER**

Name of Asst.
U.S. Attorney    Benjamin Kingsley
(if assigned)

☐ Interpreter Required    Dialect: _____

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)
Federal Bureau of Investigation

Birth
Date    2/23/1961
☑ Male    ☐ Alien
☐ Female    (if applicable)

Social Security Number _____

☐ person is awaiting trial in another Federal or State Court
(give name of court)

**DEFENDANT**

Issue: ☐ Warrant  ☑ Summons on 6/3/2014 at 9:30 a.m.

☐ this person/proceeding transferred from another district
per (circle one) FRCrP 20, 21 or 40. Show District

Location Status:

Arrest Date_____ or Date Transferred to Federal Custody_____

☐ this is a reprosecution of charges
previously dismissed which were
dismissed on motion of:
☐ U.S. Atty ☐ Defense

☐ Currently in Federal Custody
☐ Currently in State Custody
☐ Writ Required
☐ Currently on bond
☐ Fugitive

SHOW
DOCKET NO.

☐ this prosecution relates to a
pending case involving this same
defendant. (Notice of Related
Case must still be filed with the
Clerk.)

Defense Counsel (if any): Ted Cassman

☐ prior proceedings or appearance(s)
before U.S. Magistrate Judge
regarding this defendant were
recorded under

MAG. JUDGE
CASE NO.

☐ FPD  ☐ CJA  ☑ RET'D
☐ Appointed on Target Letter

Place of
offense    County

☐ This report amends AO 257 previously submitted

**OFFENSE CHARGED - U.S.C. CITATION - STATUTORY MAXIMUM PENALTIES - ADDITIONAL INFORMATION OR COMMENTS**

Total # of Counts 3

| Set | Title & Section/Offense Level (Petty = 1 / Misdemeanor = 3 / Felony = 4) | Description of Offense Charged | Count(s) |
|-----|------|------|------|
|  | PLEASE SEE ATTACHED FOR |  |  |
|  | PENALTIES |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## PENALTY SHEET ATTACHMENT

<u>Count One:</u>

18 U.S.C. § 1348 – Securities Fraud

Maximum penalties:   25 years imprisonment (18 U.S.C. § 1348)
$250,000 fine (18 U.S.C. § 3571(b)(3))
5 years supervised release (18 U.S.C. § 3583(b)(1))
$100 special assessment (18 U.S.C. § 3013)

# ATTACHMENT B

1   MELINDA HAAG (CABN 132612)
    United States Attorney

2

3   J. DOUGLAS WILSON (DCBN 812411)
    Chief, Criminal Division

4   BENJAMIN KINGSLEY (NYBN 4758389)
    Assistant United States Attorney

5        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495

6        Telephone: (415) 436-6937
         FAX: (415) 436-7234

7        Benjamin.Kingsley@usdoj.gov

8   Attorneys for the United States

9

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,          )   CASE NO: CR 14 264

14           Plaintiff,                )
                                       )   UNITED STATES'S MOTION TO SEAL
15       v.                            )   INFORMATION AND [PROPOSED] ORDER
                                       )
16  JOSEPH NOEL,                       )
                                       )
17           Defendant.                )
                                       )
18

19          The United States hereby moves the Court for an order sealing this Motion and Order, the

20  Information, and the summons.   This case involves a continuing investigation into securities fraud, and

21  disclosing it prematurely could frustrate the investigation.

22

23  DATED: May 13, 2014

                                           Respectfully Submitted,

24
                                           MELINDA HAAG
25                                         United States Attorney

26

27                                         BENJAMIN KINGSLEY
                                           Assistant United States Attorney
28  //

MOTION TO SEAL

## [PROPOSED] ORDER

Based upon the foregoing request, the Court hereby **ORDERS** that this Motion and Order, the Information, and the summons for the defendant's appearance shall be filed and kept under seal by the clerk of the Court until further order of the Court. The Court hereby further **ORDERS** that any representative of the United States Attorney's Office or the Federal Bureau of Investigation shall be allowed to obtain a copy of the Information or the summons without further order of the Court.

DATED: May 13, 2014

HON. JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

MOTION TO SEAL

# ATTACHMENT C

1   MELINDA HAAG (CABN 132612)
    United States Attorney
2
    J. DOUGLAS WILSON (DCBN 412811)
3   Chief, Criminal Division

4   BENJAMIN KINGSLEY (NYBN 4758389)
    Assistant United States Attorney
5        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
6        Telephone: (415) 436-6937
         FAX: (415) 436-7234
7        benjamin.kingsley@usdoj.gov

8   Attorneys for the United States

**F I L E D**

JUN 2 9 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT.
NORTHERN DISTRICT OF CALIFORNIA

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12   UNITED STATES OF AMERICA,          )   NO. CR 14-264 VC
                                        )
13          Plaintiff,                  )   PLEA AGREEMENT
                                        )
14      v.                              )
                                        )
15   JOSEPH NOEL                        )
                                        )
16          Defendant.                  )
                                        )
17   _____   )

18          I, Joseph Noel, and the United States Attorney's Office for the Northern District of California

19   (hereafter "the government") enter into this written plea agreement (the "Agreement") pursuant to Rule

20   11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

21   The Defendant's Promises

22          1.     I agree to plead guilty to the first and only count of the captioned Information charging

23   me with securities fraud, in violation of 18 U.S.C. § 1348. I agree that the elements of 18 U.S.C. § 1348

24   are as follows: (1) I knowingly and willfully engaged in a scheme or plan (a) to defraud, or (b) for

25   obtaining money or property by making false promises or statements; (2)  I knew that the promises or

26   statements were false; (3) I knew the promises or statements were material because they would

27   reasonably influence a person to part with money or property; (4) I acted with intent to defraud; and

28   (5) An essential part of my scheme was in connection with any security, to wit, securities of YesDTC

PLEA AGREEMENT
CR 14-264 VC

1  Holdings, Inc.

2      I agree that the maximum penalties for 18 U.S.C. § 1348 are as follows:

3      a.      a maximum prison term of twenty-five (25) years;

4      b.      a maximum fine of $250,000 or twice the gross gain or loss, whichever is
            greater;
5

6      c.      a maximum term of supervised release of five (5) years;

7      d.      restitution in an amount to be determined by the Court; and

8      e.      a mandatory special assessment of $100.

9      I acknowledge that pleading guilty may have consequences with respect to my immigration

10  status if I am not a citizen of the United States. Under federal law, a broad range of crimes are

11  removable offenses, which may include the offense to which I am pleading guilty. Removal and other

12  immigration consequences are the subject of a separate proceeding, however, and I understand that no

13  one, including my attorney or the district court, can predict to a certainty the effect of this conviction on

14  my immigration status. I nevertheless affirm that I want to plead guilty regardless of any immigration

15  consequences that may result from my guilty plea, even if the consequence is my automatic removal

16  from the United States.

17      2.      I agree that I am guilty of the offenses to which I am pleading guilty, and I agree that the

18  following facts are true:

19      Beginning in 2005, I worked as a business consultant for small cap companies in and around San

20  Francisco, California. In 2009, I helped create a partnership, Allay Online Marketing, which owned the

21  distribution rights for various products. Allay Online had an initial capitalization of approximately

22  $206,667. As managing partner, I received a 25% ownership interest in Allay Online, which I put into

23  Sonoma Winton, LLC, an entity that was held in my daughter's name. At the time, my intention was to

24  introduce my daughter to the business world. In June 2010, I instructed my daughter to open a bank

25  account for Sonoma Winton.

26      In the fall of 2009, I met Barry Honig, who I understood was a large investor in small cap

27  companies. Later that fall, Honig suggested that we do a reverse merger to create a publicly traded

28  company to take control of Allay Online's assets and that I be CEO of the new company. I was very

PLEA AGREEMENT
CR 14-264 VC                                      2

excited with this opportunity. Honig had the experience and resources to implement the reverse merger. He proposed that we utilize PR Complete Holdings, Inc., a publicly held shell company that Honig controlled, and that is what we did. Honig's attorneys drew up all of the relevant documents. In December 2009, the reverse merger was implemented, creating a new company called YesDTC Holdings, Inc. ("YesDTC"), which issued approximately 140,000,000 shares of restricted and unrestricted stock to Honig, me, and others. I also invested about $85,000 and received about 7,500,000 unrestricted shares, about 50,000,000 restricted shares, and convertible debt.

I caused all of my unrestricted shares in YesDTC to be issued to Sonoma Winton, which was still held in my daughter's name. I knew at the time that the SEC imposed restrictions on the sale of stock by a company's corporate officers, like me. I later learned that these restrictions are set forth in SEC Rule 144. I put my unrestricted YesDTC shares into Sonoma Winton because I wanted to evade the SEC restrictions on the sale of securities by an officer.

Over the next twenty-two (22) months, I used my daughter to sell YesDTC stock through Sonoma Winton and to evade the SEC's disclosure rules. I made the decisions when to sell stock. I contacted the brokers and gave instructions about what stock to sell, often, but not always, with my daughter on the line. I possessed the passwords to Sonoma Winton's online bank account, and I decided how the proceeds from the sales of YesDTC stock would be spent without consulting my daughter. In short, I used my daughter as a nominee to evade the SEC restrictions on the sale of securities by an officer. By doing so, I engaged in a scheme to defraud shareholders of YesDTC by pretending to comply with the SEC's disclosure rules restricting sales of securities by corporate officers like me when, in fact, I was secretly evading those disclosure rules.

During 2010, I worked hard as CEO to make YesDTC a successful enterprise. However, I soon realized that it was not Honig's priority to make YesDTC successful. Instead, I realized that Honig wanted to use promotions to drive up the price of YesDTC shares and then sell his shares. Honig introduced me to David Zazoff who Honig said would promote YesDTC stock. Honig said that Zazoff was a "magic maker," who could make the price of YesDTC stock rise through his services. Honig made it clear that I should not ask questions about how Zazoff achieved his success.

In the spring of 2010, Zazoff promoted YesDTC stock. Aware of Zazoff's efforts, I also caused

PLEA AGREEMENT
CR 14-264 VC                                      3

1  YesDTC to issue two press releases announcing positive news. I told Zazoff in advance that I would

2  make those press releases. The price of YesDTC stock rose significantly during May 2010. I took

3  advantage of Zazoff's promotion of YesDTC by causing Sonoma Winton to sell YesDTC stock, from

4  which I deposited approximately $57,550 of the proceeds in the Sonoma Winton bank account. By

5  doing so, I used Sonoma Winton and my daughter as nominees to evade the SEC restrictions on the sale

6  of securities by an officer. At Honig's direction I caused Sonoma Winton to send $45,000 of the

7  proceeds to Zazoff as partial compensation for his promotion of YesDTC stock.

8       In January 2011, Zazoff conducted a second promotion of YesDTC stock. At Honig's direction,

9  I caused YesDTC to compensate Zazoff for the January 2011 promotion of its stock.

10      Also during that month, I caused YesDTC to issue several press releases announcing positive

11  news. For example, in a press release dated January 11, 2011, I stated that I, the CEO of the company,

12  had purchased 7.1 million shares of stock. By doing so, I wanted to convey my confidence in the

13  company's long term prospects. But the press release was misleading because, in fact, I did not actually

14  purchase any shares. Instead, I received restricted shares in exchange for the cancelation of short term

15  loans I had made to YesDTC. And, in fact, I later sold other shares as soon as the positive news in the

16  press releases helped raise the price of the stock.

17      In this time period, there were at least two other press releases that contained factual

18  misstatements. A January 20, 2011 press release stated that YesDTC possessed exclusive worldwide

19  rights to distribute a product called "Nutrifusion," when, in fact, our distribution rights were limited to

20  specific geographic regions.

21      A January 28, 2011 press release erroneously stated that the EPA had certified that another of

22  our products, "MotorBooster," did not cause engine damage, when, in fact, the product had only been

23  registered with the EPA.

24      In addition, a January 31, 2011 press release stated that YesDTC would begin marketing a

25  product called "WordSmart" in China, when, in fact, YesDTC's agreement with WordSmart authorized

26  YesDTC to market the product only in English-speaking countries.

27      As a result of these press releases and Zazoff's promotions, the price of YesDTC stock rose

28  significantly during January 2011. When it did, I took full advantage of the price rise by causing

PLEA AGREEMENT
CR 14-264 VC               4

1  Sonoma Winton to sell approximately 5,570,000 shares of YesDTC stock in January and early February

2  2011, from which I deposited approximately $239,500 of proceeds in the Sonoma Winton bank account.

3  This was stock that I knew I was prohibited from selling without properly disclosing and registering the

4  shares in advance of the sale which I did not do.  Again, I used Sonoma Winton and my daughter as

5  nominees to evade the SEC restrictions on the sale of securities by an officer.  By doing so, I engaged in

6  a scheme to defraud shareholders of YesDTC because those shareholders were entitled to know whether

7  the CEO of YesDTC was secretly selling shares in their company.

8            In July 2011, Zazoff conducted a third promotion of YesDTC stock.  Again, I caused YesDTC to

9  issue two press releases announcing positive news during that month.  Again, the price of YesDTC stock

10  rose significantly during July 2011.  And again, I took advantage of the promotion of YesDTC by

11  illegally causing Sonoma Winton to sell YesDTC stock, from which I deposited approximately $68,199

12  of proceeds in the Sonoma Winton bank account.  To do this, I again used Sonoma Winton and my

13  daughter as nominees to evade the SEC restrictions on the sale of securities by an officer.  Honig

14  instructed me to cause YesDTC to send compensation to Zazoff for the July 2011 promotion of its stock,

15  but I refused.

16            I received a total of approximately $367,221 in proceeds from my illegal sales of YesDTC stock

17  as set forth above.  Most of this money I reinvested in YesDTC.  But I acknowledge that I personally

18  made a profit from these illegal stock sales of at least $55,855, which I am now prepared to forfeit.

19            I knew that it was wrong to use my daughter as a nominee to avoid the SEC's restrictions on the

20  sales of stock by a corporate officer.  I knew that it was wrong to sell my shares when the YesDTC stock

21  price was artificially high as a result of the promotional efforts of David Zazoff and me.

22            3.       I agree to give up all rights that I would have if I chose to proceed to trial, including the

23  rights to a jury trial with the assistance of an attorney; to confront and cross-examine government

24  witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth

25  Amendment claims; to any further discovery from the government; and to pursue any affirmative

26  defenses and present evidence.

27            4.       I agree to give up my right to appeal my conviction, the judgment, and orders of the

28  Court.  I also agree to waive any right I have to appeal any aspect of my sentence, including any orders

PLEA AGREEMENT
CR 14-264 VC                                              5

1    relating to forfeiture and or restitution. I also agree to give up any right I may have to appeal my

2    sentence, except that I reserve my right to appeal an upward departure from the Guideline imprisonment

3    range determined by the Court or an upward variance under 18 U.S.C. § 3553(a).

4         5.    I agree not to file any collateral attack on my conviction or sentence, including a petition

5    under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was

6    ineffective in connection with the negotiation of this Agreement or the entry of my guilty plea. I also

7    agree not to seek relief under 18 U.S.C. § 3582.

8         6.    I agree not to ask the Court to withdraw my guilty plea at any time after it is entered. I

9    understand that by entering into this Agreement: (a) I agree that the facts set forth in Paragraph 2 of this

10   Agreement shall be admissible against me under Fed. R. Evid. 801(d)(2)(A) in any subsequent

11   proceeding, including at trial, in the event I violate any of the terms of this Agreement, and (b) I

12   expressly waive any and all rights under Fed. R. Crim. 11(f) and Fed. R. Evid. 410 with regard to the

13   facts set forth in Paragraph 2 of this Agreement in any such subsequent proceeding. I understand that

14   the government will not preserve any physical evidence obtained in this case.

15        7.    I agree that the Court will use the Sentencing Guidelines to calculate my sentence. I

16   understand that the Court must consult the Guidelines and take them into account when sentencing,

17   together with the factors set forth in 18 U.S.C. § 3553(a). I also understand that the Court is not bound

18   by the Guidelines calculations below, the Court may conclude that a higher Guidelines range applies to

19   me, and, if it does, I will not be entitled, nor will I ask to withdraw my guilty plea. I also agree that

20   regardless of the sentence that the Court imposes on me, I will not be entitled, nor will I ask, to

21   withdraw my guilty plea. I further agree that, other than seeking a possible downward departure

22   pursuant to U.S.S.G. § 5K1.1 and/or 18 U.S.C. § 3553(e), I will not ask for any other adjustment to or

23   reduction in the offense level or for a downward departure or variance from the Guidelines range as

24   determined by the Court. But I also reserve my right to argue for a variance from the Guidelines range

25   determined by the Court based on 18 U.S.C. § 3553(a) factors. I understand that the government may

26   oppose this argument. The parties have reached no agreement regarding my Criminal History Category.

27        I agree that the Sentencing Guidelines offense level will be calculated as follows, with the

28   exception of the following: I reserve the right to argue that the loss or gain amount under U.S.S.G.

PLEA AGREEMENT
CR 14-264 VC          6

§ 2B1.1(b)(1) is approximately $55,855, resulting in a six-point increase, whereas the government may argue for a higher loss or gain amount, including a gain or loss of up to approximately $367,000, resulting in a twelve-pointed increase, and I reserve the right to argue that there were between 50 and 250 victims of my scheme under U.S.S.G. § 2B1.1(b)(2), resulting in a four-point increase, whereas the government may argue that there were greater than 250 victims, resulting in a six-point increase.

I agree that the loss or gain amount is between $55,855 and $367,000.   I therefore agree that the Guidelines offense level is as follows:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1): | +7 |
| b. | Specific offense characteristics: | |
| | Loss, U.S.S.G. § 2B1.1(b)(1) (loss or gain of between $55,855 and $367,221) | +6 to +12 |
| | Victims, U.S.S.G. § 2B1.1(b)(2) (50 or more victims) | +4 or +6 |
| | Officer, U.S.S.G. § 2B1.1(b)(18)(A)(i) (officer of a publicly-traded company) | +4 |
| c. | Acceptance of Responsibility: | |
| | If I meet the requirements of U.S.S.G. § 3E1.1 through sentencing, then I may be entitled to a three (3) level reduction | -3 |
| d. | Adjusted Offense Level: | 18 to 26 |

8.      I agree that regardless of any other provision of this Agreement, the government may and will provide the Court and the Probation Office with all information relevant to the charged offense and the sentencing decision.

9.      I agree to pay restitution for all the losses caused by all the schemes or offenses with which I was charged in this case, and I agree that the amount of restitution will not be limited to the loss attributable to the count to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I agree that the Court may order and I will pay restitution in an amount to be determined by the Court. I agree that any fine, forfeiture, or restitution imposed by the Court against me will be immediately due and payable and subject to immediate collection by the government and I understand that the government may seek immediate collection of the entire fine, forfeiture, or restitution from any assets without regard to any

1  schedule of payments imposed by the Court or established by the Probation Office.  I agree that I will

2  make a good faith effort to pay any fine, forfeiture, or restitution I am ordered to pay.  Before or after

3  sentencing, I will upon request of the Court, the government, or the Probation Office, provide accurate

4  and complete financial information, submit sworn statements and give depositions under oath

5  concerning my assets and my ability to pay, surrender assets I obtained as a result of my crimes, and

6  release funds and property under my control in order to pay any fine, forfeiture, or restitution.  I agree to

7  pay the special assessment at the time of sentencing.

8      10.    I agree to cooperate with the U.S. Attorney's Office before and after I am sentenced.  My

9  cooperation will include, but will not be limited to, the following:

10      a.    I will respond truthfully and completely to any and all questions put to me,
11          whether in interviews, before a grand jury or at any trial or other
           proceeding;

12      b.    I will provide all documents and other material asked for by the
13          government;

14      c.    I will testify truthfully at any grand jury, court or other proceeding as
           requested by the government;

15      d.    I will surrender any and all assets acquired or obtained directly or
16          indirectly as a result of my illegal conduct;

17      e.    I will request continuances of my sentencing date, as necessary, until my
           cooperation is completed;

18      f.    I will not reveal my cooperation, or any information related to it, to
19          anyone without prior consent of the government.

20      g.    I will participate in undercover activities under the supervision of law
           enforcement agents or the U.S. Attorney's Office.

21      11.    I agree that the government's decision whether to file a motion pursuant to U.S.S.G.

22  § 5K1.1, as described in the government promises section below, is based on its sole and exclusive

23  decision of whether I have provided substantial assistance and that decision will be binding on me.  I

24  understand that the government's decision whether to file such a motion, or the extent of the departure

25  recommended by any motion, will not depend on whether convictions are obtained in any case.  I also

26  understand that the Court will not be bound by any recommendation made by the government.

27      12.    I agree not to commit or attempt to commit any crimes before sentence is imposed or

28  before I surrender to serve my sentence.  I also agree not to violate the terms of my pretrial release; not

PLEA AGREEMENT
CR 14-264 VC                                      8

to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the government; and to comply with any of the other promises I have made in this Agreement. I agree that if I fail to comply with any promises I have made in this Agreement, then the government will be released from all of its promises in this Agreement, including those set forth in the Government's Promises Section below, but I will not be released from my guilty plea.

13.    If I am prosecuted after failing to comply with any promises I made in this Agreement, then (a) I agree that any statements I made to any law enforcement or other government agency or in Court, whether or not made pursuant to the cooperation provisions of this Agreement, may be used in any way; (b) I waive any and all claims under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, to suppress or restrict the use of my statements, or any leads derived from those statements; and (c) I waive any defense to any prosecution that it is barred by a statute of limitations, if the limitations period has run between the date of this Agreement and the date I am indicted.

14.    I agree that this Agreement contains all of the promises and agreements between the government and me, and supersedes any other agreements, written or oral. No modification of this Agreement shall be effective unless it is in writing and signed by all parties.

15.    I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of California only, and does not bind any other federal, state, or local agency.

**The Government's Promises**

16.    The government agrees not to file any additional charges against the defendant that could be filed as a result of the investigation that led to the captioned Information.

17.    The government agrees to recommend the Guideline calculations set out above unless the defendant violates the terms of the Agreement above or fails to accept responsibility.

18.    The government agrees not to use any statements made by the defendant pursuant to this Agreement against him, unless the defendant fails to comply with any promises in this Agreement.

19.    If, in its sole and exclusive judgment, the government decides that the defendant has cooperated fully and truthfully, provided substantial assistance to law enforcement authorities within the meaning of U.S.S.G. § 5K1.1, and otherwise complied fully with this Agreement, it will file with the

PLEA AGREEMENT
CR 14-264 VC

1  Court a motion under § 5K1.1 and/or 18 U.S.C. § 3553 that explains the nature and extent of the

2  defendant's cooperation and recommends a downward departure.

3  <u>The Defendant's Affirmations</u>

4      20.    I confirm that I have had adequate time to discuss this case, the evidence, and the

5  Agreement with my attorney and that my attorney has provided me with all the legal advice that I

6  requested.

7      21.    I confirm that while I considered signing this Agreement, and at the time I signed it, I

8  was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand

9  the Agreement.

10      22.    I confirm that my decision to enter a guilty plea is made knowing the charge that has

11  been brought against me, any possible defenses, and the benefits and possible detriments of proceeding

12  to trial.  I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or

13  threatened me to enter into this Agreement.

14

15

16  Dated: June 23, 2014

                     JOSEPH NOEL

17                       Defendant

18

19

20                       MELINDA HAAG

21                       United States Attorney

22  Dated: June 23, 2014

23                       BENJAMIN KINGSLEY

24                       Assistant United States Attorney

25

26

27

28

PLEA AGREEMENT
CR 14-264 VC

23.     I have fully explained to my client all the rights that a criminal defendant has and all the terms of this Agreement.  In my opinion, my client understands all the terms of this Agreement and all the rights my client is giving up by pleading guilty, and, based on the information now known to me, my client's decision to plead guilty is knowing and voluntary.

Dated: June 23, 2014

TED W. CASSMAN
Attorney for Defendant

PLEA AGREEMENT
CR 14-264 VC                                          11

# ATTACHMENT D

JINA L. CHOI (N.Y. Bar No. 2699718)
TRACY L. DAVIS (Cal. Bar No.184129)
  Email:  davist@sec.gov
AARON P. ARNZEN (Cal. Bar No. 218272)
  Email:  arnzena@sec.gov
HEATHER E. MARLOW (Cal. Bar No. 215261)
  Email:  marlowh@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| JOSEPH A. NOEL | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.     From approximately 2009 through 2011, Joseph A. Noel engaged in a manipulative "pump and dump" scheme to artificially inflate the price and volume of a San Francisco, California based penny stock company he controlled, YesDTC Holdings, Inc. ("YesDTC"), and to covertly sell YesDTC shares he held into the public market for a profit.  Noel was the founder and Chief Executive Officer of YesDTC, which purports to be a direct-to-consumer marketing company specializing in internet and retail marketing programs and infomercials.

2. In or around the fall of 2009, Noel began laying the foundation for this scheme by taking YesDTC public through a reverse merger with a public shell company. Following the reverse merger, Noel covertly acquired approximately 40 million additional YesDTC shares in the name of a nominee company, so that he controlled approximately 65% of YesDTC's total outstanding shares.

3. Unbeknownst to investors, in January and July 2011, Noel artificially inflated YesDTC's stock price by writing, approving and disseminating false press releases that stated that YesDTC had certain exclusive distribution rights; that certain YesDTC products had government certifications and were profitable. None of this was true; yet in response to Noel's promotional campaigns, YesDTC's thinly traded stock rose in price, volume, or both. Noel sold millions of shares into the rise for a profit of over $300,000.

4. Noel carried out the scheme by using the nominee company to sell millions of YesDTC shares, without disclosing, as he was required to do, that he was the beneficial owner or seller of those shares or that he controlled the proceeds of those sales.

5. Noel also failed to register his YesDTC stock sales and failed to file the required notices with the Commission stating his beneficial ownership and intent to sell YesDTC shares. Noel thus violated and unless restrained and enjoined will continue to violate the antifraud, registration and other provisions of the federal securities laws.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u].

7. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa]. Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

8. Venue is proper in the Northern District of California pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. At all

1  relevant times, Noel resided in this District.  In addition, acts, practices, and courses of business that

2  form the basis for the violations alleged in this complaint occurred in this District.

3  **INTRADISTRICT ASSIGMENT**

4       9.     Under Civil Local Rule 3-2, assignment to the San Francisco Division of this Court is

5  proper because a substantial part of the events that gave rise to the claims alleged in this Compliant

6  occurred in the County of San Francisco.

7  **DEFENDANT**

8       10.     **Joseph A. Noel**, age 53, resides in San Francisco, California.  Noel founded YesDTC

9  in or around December 2009.  Noel served as its President and CEO from its inception until February

10  23, 2012, when he resigned.  Also, from approximately 2009 through 2012, Noel worked as a penny

11  stock promoter in or around San Francisco, California.  From about 1992 to 2012, Noel worked in the

12  securities industry, including at times as a licensed securities professional.  During the Commission's

13  investigation that preceded this action, Noel invoked his Fifth Amendment privilege, refusing to

14  answer questions substantively during sworn testimony.

15  **RELEVANT ENTITIES**

16       11.     **YesDTC Holdings, Inc.**, is a Nevada corporation headquartered in San Francisco,

17  California.  YesDTC purports to specialize in direct-to-consumer marketing (e.g., infomercials).  In

18  December 2009, YesDTC became a public company by merging with PR Complete Holdings, Inc., a

19  public "shell" corporation without meaningful assets or operations.  YesDTC is a company required

20  to file periodic reports with the Commission pursuant to Section 12(g) of the Exchange Act, but since

21  about November 14, 2011, YesDTC has failed to file the required reports.  YesDTC ceased business

22  operations on or about February 23, 2012 and YesDTC directors and officers resigned their positions

23  effective February 27, 2012.  During the relevant time period, YesDTC traded at prices below $5.00

24  per share, was listed on OTC Link (operated by OTC Markets Group Inc.) and was a penny stock,

25  under 17 C.F.R. § 240.3(a)(51)(A).

26       12.     **Sonoma Winton, LLC**, is an entity founded by Noel in Nevada in December 2009.

27  Sonoma Winton ceased doing business on or around March 23, 2012.

28

COMPLAINT                             3

## FACTUAL ALLEGATIONS

### A.   Noel Forms Sonoma and Takes YesDTC Public

13.   Beginning in or about February 2009, Noel formed various corporate entities he later used to conduct his YesDTC pump and dump scheme. Noel used the entities to covertly acquire and sell millions of YesDTC shares into the public market at artificially inflated prices, concealing his true identity as the seller and beneficial owner of those shares.

14.   First, in or about February 2009, Noel created Sonoma Winton, LLC ("Sonoma") and appointed his then 18-year old daughter as the sole member of Sonoma. Noel controlled all of Sonoma's operating functions; and his daughter, acting as the sole managing member of Sonoma, executed Noel's directives.

15.   Next, in or about November 2009, Noel incorporated YesDTC, Inc. in Delaware. Finally, on or around December 11, 2009, YesDTC, Inc. entered into a reverse merger agreement with PR Complete Holdings, Inc., a Nevada corporation which had no meaningful assets or operations but which was technically "public" because it had registered with the Commission. On or about January 19, 2010, the merged company changed its name to YesDTC Holdings, Inc. As a result of an immediate stock split, approximately 94 million restricted YesDTC shares and approximately 44 million non-restricted YesDTC shares became outstanding. Noel kept approximately 40 million YesDTC shares for himself.

### B.   Noel Conceals His Identity and Uses Sonoma as a Nominee to Acquire Approximatly 40 Million Additional YesDTC Shares

16.   From approximately November 2009 through October 2011, Noel, through the Sonoma accounts, amassed approximately 40 million additional YesDTC shares in Sonoma's name for his benefit. Thus, from November 2009 through October 2011, Noel controlled, either personally or through Sonoma, approximately 90.4 million YesDTC shares, approximately 65% of YesDTC's total outstanding shares.

### C.   Noel Dumps Large Amounts of YesDTC Stock During Two Pump and Dump Campaigns in 2011

COMPLAINT                                                4

17.     During 2011, Noel conducted two distinct pump and dump promotional campaigns involving YesDTC stock. In each, Noel used Sonoma as a nominee to conceal his sales from the public and to profitably sell YesDTC shares by taking advantage of an increasing market price that had resulted from his promotional campaigns. Also in each, Noel prepared, had final review over, and issued on behalf of YesDTC, false and misleading press releases concerning the features, profitability, and distribution rights of the products YesDTC licensed and marketed. The press releases were distributed to online newswires.

18.     In the first pump-and-dump campaign, beginning on or around January 20, 2011, Noel caused YesDTC to issue a press release stating that it was selected to serve as the exclusive distributor of the NutriFusion line of nutraceutical supplement products "for the worldwide consumer market." In fact, per the agreement between YesDTC and NutriFusion, YesDTC's distribution territory was limited to Asia only and was not worldwide. Trading volume in YesDTC shares increased approximately 100% over the prior day's volume on January 20, 2011, after the press release went out.

19.     On or around January 28, 2011, YesDTC issued a press release announcing its introduction of an automobile engine conditioner called MotorBooster. The release stated that MotorBooster "has received Environmental Protection Agency ("EPA") certification to not cause engine damage." Contrary to the release, the EPA did not make any such certification. On January 28, 2011, the trading volume in YesDTC shares increased approximately 230% from the prior day and its high share price increased approximately 30% from the prior two trading days' high average.

20.     On or about January 31, 2011, YesDTC issued a press release stating that YesDTC was launching the WordSmart language learning product, sponsored by celebrity game-show host Alex Trebek, into the Chinese market. In truth, YesDTC had no rights to sell or market the WordSmart product in China. On January 31, 2011, the trading volume in YesDTC shares increased approximately 650% from the prior day and its high share price jumped approximately 75% from the prior day high.

21. Between January and February 2011, Noel sold approximately 5.57 million shares from Sonoma's account – approximately 20% of Sonoma's YesDTC holdings – during the January 2011 pump and dump period.

22. In the months following this first promotional campaign, Noel continued to issue false press releases to create an appearance that YesDTC was profitable. For instance, on or around February 22, 2011 and February 24, 2011, YesDTC issued press releases stating that it "has reached an agreement with Mannings Drugs ("Mannings") in Hong Kong to distribute the NutriFusion nutraceutical supplement product in up to 300 stores throughout Hong Kong." This was not true. Mannings Hong Kong and Macau had not entered into an agreement with YesDTC Holdings, Inc.

23. In or around July 2011, Noel orchestrated a second, distinct pump and dump campaign wherein he wrote, and caused YesDTC to issue, several press releases touting falsely that the University of Alaska, Fairbanks (UAF) would be testing YesDTC's proprietary MotorBooster fuel additive tablet.

24. On or about July 15, 2011, Noel caused YesDTC to issue a press release stating that "UAF will commence a performance test of the Company's [YesDTC] proprietary MotorBooster tablet ..." and that YesDTC has "been in communication with UAF for a while over the promising results of the MotorBooster." Contrary to these statements, UAF had not spoken with Noel or persons at YesDTC and had not agreed to test, and did not test, MotorBooster. On or around July 15, 2011, the trading volume in YesDTC shares rose approximately 280% from the prior day, and its high share price increased approximately 2% over the prior day high.

25. On or about July 18, 2011, Noel caused YesDTC to issue another press release, again announcing tests of MotorBooster "being conducted by UAF." Like the earlier July 2011 press release, these statements were false. The trading volume in YesDTC shares on this day rose approximately 5000% from the prior day and its high share price increased approximately 110% over the prior day's high.

26. On or about the following day, July 19, 2011, Noel caused YesDTC to issue a third press release, again touting falsely that UAF would be testing MotorBooster and adding that Motorbooster "has received EPA Certification to not cause engine damage." The trading volume in

COMPLAINT                                      6

1  YesDTC shares remained approximately 2000% higher than the volume traded on or around July 14,

2  2011, before the three announcements were made. YesDTC's share price traded at approximately the

3  same higher level achieved on or around July 18, 2011.

4      27.    In total during the July 2011 pump and dump, Noel sold approximately 6 million

5  YesDTC shares that were held in Sonoma's accounts, comprising approximately 25% of Sonoma's

6  YesDTC holdings.

7      28.    Each of the above-described false statements made in press releases on behalf of

8  YesDTC by Noel was material. The false statements misrepresented YesDTC's profitability, its

9  product line and its rights to distribute those products in certain geographic areas. As a result, there

10  were substantial spikes in the market price, and the volume of trading, for YesDTC shares following

11  the release of the false information to the market. Indeed, Noel was able to profitably sell YesDTC

12  shares into the artificially inflated market reaping approximately $315,000 in net profits.

13      29.    Noel also knew, or was reckless in not knowing, that each of the statements was false

14  or misleading. Noel, as CEO, negotiated and signed YesDTC's product licensing and marketing

15  agreements. In addition, Noel reviewed and had final say on all YesDTC press releases before they

16  were distributed to the public.

17      **D.    Noel Used Sonoma As A Nominee to Intentionally Conceal His Identity**

18      30.    From approximately February 2009 through February 2012, Noel controlled Sonoma

19  and used Sonoma to covertly acquire YesDTC stock for Noel's benefit, to open bank accounts, to pay

20  YesDTC third-party stock promoters, to act as a cash supply to Noel and YesDTC, and to conceal

21  Noel's true identity as he orchestrated sales of YesDTC shares into the public market through

22  unregistered transactions at artificially inflated prices.

23      31.    Noel's daughter acted on behalf of Sonoma with explicit direction from Noel. Noel

24  directed his daughter to open Sonoma brokerage accounts, telling her when to do so and identifying

25  the particular brokerage firm with which the accounts should be opened. Noel completed the

26  brokerage account opening applications and broker requests for the Sonoma accounts in order to

27  arrange for YesDTC shares to be deposited into Sonoma's brokerage accounts. In addition, Noel

28  signed his daughter's name on multiple documents.

COMPLAINT                                    7

32.     Additionally, Noel also determined when to sell YesDTC shares into the public market, and decided how many shares to sell.  Noel initiated calls to Sonoma's broker repeatedly and facilitated and participated in conference calls between Sonoma's broker and his daughter on the days that Sonoma placed orders to sell YesDTC stock.

33.     Despite controlling the sales of YesDTC shares through the Sonoma accounts, Noel disclaimed beneficial ownership of Sonoma's YesDTC shares, including in the 2010 YesDTC annual report filed on Form 10-K on or around April 15, 2011.

34.     Noel knew, or was reckless in not knowing, that he was manipulating the securities market through his use of Sonoma as a nominee and his covert sales of YesDTC shares into the market to profit from artificially high prices.

**E.     Noel Failed to Register His YesDTC Stock Sales and Failed to File the Required Notice of His Ownership Stake and Sales Transactions**

35.     From approximately May 2010 through September 2011, Noel, using Sonoma as a nominee, sold approximately 15 million YesDTC shares to the public.  Thus, in addition to the approximately 13 million YesDTC shares Noel sold during the January 2011 and July 2011 pump and dump periods, Noel sold approximately 2.4 million additional YesDTC shares in unregistered transactions from May 2010 through September 2011.  Contrary to the requirements of the federal securities laws, Noel did not register these transactions with the Commission and no exemption from registration applied to those transactions.

36.     From approximately May 2010 throughSeptember 2011 while Noel used Sonoma as a nominee to sell YesDTC stock, Noel was the CEO of YesDTC and was also the beneficial owner of, and controlled accounts that held, more than ten percent of YesDTC stock.  Accordingly, Noel was required under Section 16 of the Exchange Act to report his ownership stake in YesDTC shares, as well as to report changes in his ownership or control, including his numerous sales of YesDTC shares.  Noel's failure to register his sales of YesDTC stock, as well as his failure to file the requisite notices required by the Exchange Act, allowed Noel to further conceal from the market his true identity and his sales of YesDTC stock.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

37.     Paragraph numbers 1 through 36 are re-alleged and incorporated herein by reference.

38.     By engaging in the conduct set forth above, Noel directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities.

39.     By reason of the foregoing, Noel directly or indirectly violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder and unless restrained and enjoined will continue to violate these provisions.

### SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

40.     Paragraph numbers 1 through 36 are re-alleged and incorporated herein by reference.

41.     By engaging in the conduct set forth above, Noel directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails:  (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

42.     By reason of the foregoing, Noel directly or indirectly violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and unless restrained and enjoined will continue to violate this provision.

### THIRD CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

COMPLAINT                                          9

43.     Paragraph numbers 1 through 36 are re-alleged and incorporated herein by reference.

44.     By engaging in the conduct set forth above, Noel directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, offered to sell and sold securities issued by YesDTC.

45.     No registration statement was filed with the Commission or was in effect with respect to the securities offered and sold by Noel prior to the offer or sale of these securities and no exemption from registration applied to those transactions.

46.     By reason of the foregoing, Noel directly or indirectly violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] and unless restrained and enjoined will continue to violate these provisions.

## FOURTH CLAIM FOR RELIEF

### Violations of Section 16(a) of the Exchange Act

47.     Paragraph numbers 1 through 36 are re-alleged and incorporated herein by reference.

48.     By engaging in the conduct set forth above, Noel failed to file initial and annual statements accurately reflecting his beneficial ownership of, and control over, YesDTC's stock; and statements accurately reflecting his changes in beneficial ownership of, and control over, YesDTC's stock.  By reason of the foregoing, Noel violated and, unless restrained and enjoined, will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Permanently enjoin Defendant Noel from directly or indirectly violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Sections 10(b) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78p(a)] and Rules 10b-5 and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5 and 240.16a-3].

### II.

COMPLAINT                                                10

1   Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of

2   the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit Defendant Noel from acting as an officer or

3   director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange

4   Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act

5   [15 U.S.C. § 78o(d)];

6                                              III.

7   Prohibit Defendant Noel from engaging in any offering of a penny stock pursuant to Securities

8   Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

9                                              IV.

10   Enter an order requiring Defendant Noel to disgorge his ill-gotten gains according to proof,

11   plus prejudgment interest thereon.

12                                              V.

13   Retain jurisdiction of this action in accordance with the principles of equity and the Federal

14   Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

15   may be entered, or to entertain any suitable application or motion for additional relief within the

16   jurisdiction of this Court.

17                                              VI.

18   Grant such other and further relief as this Court may determine to be just, equitable, and

19   necessary.

20

21                                              Respectfully submitted,

22

23   Dated: November 17, 2014

24                                              Heather E. Marlow, Esq.
                                               Attorney for Plaintiff
25                                             SECURITIES AND EXCHANGE
                                               COMMISSION
26

27

28

COMPLAINT                                      11